# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MATTHEW RYAN VINCIL,

    *Plaintiff*,

v.                                         CASE NO. 12-CV-12728

COMMISSIONER OF               DISTRICT JUDGE VICTORIA A. ROBERTS
SOCIAL SECURITY,                MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, and that the case be **REMANDED FOR AN AWARD OF BENEFITS**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 14.)

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff was 25 years of age at the time of the most recent administrative hearing. (Tr. at 36.) Plaintiff's employment history includes work as a cook for seven years, as a finisher at a steel plant for three years, and as a cabinet maker, car porter and stock person for less than a year each. (Tr. at 135.) Plaintiff filed the instant claims on December 18, 2008, alleging that he became unable to work on October 31, 2008. (Tr. at 102, 105.) The claims were denied at the initial administrative stage. (Tr. at 55, 56.) In denying Plaintiff's claims, the Commissioner considered multiple sclerosis as a possible basis for disability. (*Id.*) On September 20, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Patricia S. McKay, who considered the application for benefits *de novo*. (Tr. at 15-31, 32-54.) In a decision dated December 22, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 27.) Plaintiff requested a review of this decision on January 4, 2011. (Tr. at 13.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on April 25, 2012, when, after review of additional exhibits[2] (Tr. at 164-67, 594-736), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On June 21, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.  Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137,

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a

different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq*., and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who

become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth

5

step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2013, and that Plaintiff had engaged in substantial gainful activity after the alleged onset date, but that he did not engage in substantial gainful activity on a consistent basis throughout the entire period at issue. (Tr. at 20.) At step two, the ALJ found that Plaintiff's multiple sclerosis (relapsing and remitting) was "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 21.) At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (Tr. at 25-26.) The ALJ also found that Plaintiff was 23 years old on the alleged disability onset date and, thus, a younger individual (between the ages of 18 and 44). (Tr. at 26.) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 21-25.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 27.)

### E.   Administrative Record

The evidence of record reveals that Plaintiff sustained a "concussion, closed head injury" in January 2007. (Tr. at 197.) In March 2007, Plaintiff sought medical care because of spasticity, headaches, numbness and discoordination on the left side of his body and was diagnosed with multiple sclerosis. (Tr. at 42, 182, 207.) Plaintiff underwent a lumbar puncture at that time. (Tr. at 188.) An MRI of Plaintiff's brain revealed

> [m]ultiple foci of increased signal in the subcortical deep and periventricular white matter, brain stem and bilateral cerebellum, some of which demonstrate contrast enhancement, some of them demonstrate perpendicular orientation to the lateral ventricles. These findings are suspicious for demyelinating process such as multiple sclerosis. These findings are new from the prior study dated 11/17/03.

(Tr. at 192.) In addition, an MRI of the cervical spine taken at the same time showed "[f]oci of increased signal in the cord C2 to C6 with contrast enhancement suspicious for demyelineating process of multiple sclerosis." (Tr. at 192-93.) On March 28, 2007, Plaintiff was examined by Lee Marshall, D.O., who found that Plaintiff's

> [c]ranial nerves 2-12 are fully and symetrically intact. Muscle tone is increased with spasticity in the left, greater than right hemisoma. Bilateral extensor plantar reflexes and 6 to 8 beat ankle clonus bilaterally. Bilateral Hoffman sign. Gait is spastic and ataxic and quite unstable. He required holding on to a stationary object for stability. There is no apparent tendency for him to veer to one direction. He is unable to tandem gait or heel to toe walk successfully. There are no deficits to pinprick, temperature, vibration, proprioception, stereognosis or graphesthesia. No obvious neglect. Muscle bulk is normal. No fasciculations or atrophy are identified. He does have some mild dysmetria and dyssynergia but no pathology rebound with cerebellar testing.

(Tr. at 199-200.) Dr. Marshall warned that Plaintiff "must stop smoking cigarettes[.]" (Tr. at 201.)

Plaintiff's examinations were "stable" and "unchanged" for some time. (Tr. at 410, 413, 415.) Plaintiff underwent IV infusion medication therapy (SoluMedrol) through December 2008. (Tr. at 229-399.) Plaintiff's examinations continued to be "stable" and "unchanged." (Tr. at 431, 433, 434.)

An MRI of the cervical spine taken on February 26, 2008, showed "[m]ultiple foci of increased signal on T2 weighted images are found within the spinal cord from C2 down through C6. These do not demonstrate enhancement following the administration of intravenous contrast and do not demonstrate abnormal signal on T1 weighted images. These are much improved compared to the prior examination" of March 2007. (Tr. at 420, 456.) The report of an MRI of Plaintiff's brain taken on the same date stated:

> Abnormal study again reveals deep white matter lesions consistent with demyelination from multiple sclerosis. Overall there is improvement in both supra and infratentorial areas with diminishment in size and number of lesions. New lesion left occipital periventricular region noted. None of the lesions seen at this time exhibit enhancement. There is no mass effect.

(Tr. at 455, 458.)

On March 3, 2008, Dr. Marshall stated that Plaintiff showed "[m]ild interval improvement compared to February 20, 2008," and that Plaintiff's multiple sclerosis was "currently in

7

remission[.]" (Tr. at 406.) It was also noted that Plaintiff was experiencing "[h]eadaches, characterized as muscle tension and migraine with recent exacerbation." (*Id.*)

On July 10, 2008, Dr. Marshall stated that Plaintiff had "tried working construction and he would like to apply for Disability. He is realizing his limitations at this time." (Tr. at 404, 470.) Dr. Marshall noted: "Stable and unchanged neurologic examination with evidence of multiple sclerosis involving the brain and spinal cervical cord with most recent magnetic resonance imaging study in February 2008 showing considerable interval improvement in both of these areas." (*Id.*)

On July 28, 2008, Dr. Marshall completed a Physical Capacities Evaluation Medical Assessment form indicating that Plaintiff could sit for three hours, stand or walk for three hours of an eight-hour workday, occasionally lift up to twenty pounds, and perform simple grasping, but could not use arm controls or perform fine manipulation. (Tr. at 426.) Dr. Marshall also stated that Plaintiff could not use leg controls and that he would require one twenty-minute rest period per hour in addition to a thirty-minute lunch. (Tr. at 427.)

On October 23, 2008, Dr. Marshall noted that Plaintiff "has been doing very well and denies imbalance, weakness, fatigue, or change in bowel/bladder control . . . . He reports no significant headache recurrence." (Tr. at 403, 440, 469.) Dr. Marshall also cautioned that Plaintiff was "still smoking despite my strongly advising him against this" because of the "significantly increased risk of cerebrovascular events . . . ." (*Id.*)

On December 1, 2008, Dr. Marshall wrote a letter on behalf of Plaintiff's application for disability benefits wherein he stated that Plaintiff had been "aggressively treated with immunomodulatory therapy, as well as intravenous steroids" and that Plaintiff's "strength and imbalance have considerably improved; however, he is often bothered by significant fatigue and pain, for which I am treating him." (Tr. at 402, 439.) Dr. Marshall also noted that Plaintiff "has been very compliant in taking hi[s] medications as directed." (*Id.*) Dr. Marshall concluded that "[i]t is my neurologic opinion that Mr. Vincil is not capable of work requiring extensive physical labor, climbing, or working at heights with dangerous machinery as he still suffers from some dyscoordination with numbness and tingling of the extremities." (*Id.*)

On December 30, 2008, Dr. Marshall indicated that Plaintiff "remains headache-free" and "denies imbalance or bowel/bladder disturbance," but was "still smoking cigarettes" despite Dr. Marshall's "continually and strongly advising him against this" because of the "increased risk of cerebrovascular disease related to cigarette smoking." (Tr. at 401, 438.) Dr. Marshall noted that Plaintiff's

> [f]rontal releasing signs are mild but symmetrical. Cranial nerves II through XII are otherwise fully and symmetrically intact. There is no past-pointing or pathological rebound. Gait is narrow-based. Tandem gait is performed. Romberg is negative. Proprioception is intact. Reflexes are brisk at 3/4 with normal muscle bulk, tone, and strength. Plantar reflexes are equivocally extensor. There is no clonus noted. Hoffman sign is absent. No sensory level is present to vibratory perception or pinprick.

(Tr. at 401.) Dr. Marshall's conclusion: "[s]table neurologic examination with diagnosed multiple sclerosis with demyelinating lesions identified involving the cervical spinal cord and brain." (*Id.*)

On May 1, 2009, Dr. Marshall noted that Plaintiff's "headaches are well controlled." (Tr. at 520.) On November 19, 2009, an MRI of the cervical spine showed an "[i]ncrease in the number and conspicuity of the demyelinating plaques within the cervical spinal cord and in the medulla when compared to the previous study of 2/26/08" and "[n]o findings of abnormal enhancement to suggest active plaque status." (Tr. at 453.)

On April 5, 2010, Dr. Marshall noted that Plaintiff "currently has no medical insurance[,] [i]s in the process of trying to obtain Medicaid," and that "[a]s a result, he is no longer receiving intravenous steroids" and was "off Provigil," although he was able to "continue with weekly Avonex injections." (Tr. at 430, 521.) Nonetheless, Dr. Marshall found a "[s]table neurologic examination, relatively unchanged compared to December 9, 2009," and that Plaintiff's "[c]ephalgia, combination of muscle tension and migraine without aura, [were] also well controlled." (*Id.*)

On July 3, 2010, Dr. Marshall indicated that,

> [d]espite treatment with immunomodulatory therapy, Mr. Vincil continues to experience problems with gait imbalance, diminished stamina, endurance, and pain relating to muscle spasticity. It is my neurological opinion that he is unable to maintain employment in any position for a 12-month period of time. It is hopeful

9

that his condition will stabilize to the point of allowing gainful employment subsequently.

(Tr. at 519.)

An undated opinion from Dr. Marshall states that, "as a result of [Plaintiff's] multiple sclerosis[,] [he has] disorganization of motor function described as significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements or gait end station." (Tr. at 593.) Dr. Marshall also stated that Plaintiff has "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." (*Id.*)

Plaintiff testified at the administrative hearing that he "worked in a steel mill for about two years until I was diagnosed . . . [a]nd I tried to do the kitchen thing after the mill and gas stations and I just couldn't be on my feet anymore at work." (Tr. at 39.) Plaintiff also stated that he quit working part-time because he "couldn't do it no more. Not being able to be there reliably with my health wouldn't allow it . . . ." (Tr. at 40.) Plaintiff indicated that he has a driver's license, owns a car, and "might be able to drive one week," but then will "wake up one day, [and] have such a bad headache and not be able to drive . . . ." (Tr. at 40-41.) Plaintiff stated that he is able to take care of his own hygiene, cook for himself, do laundry, and do some dusting and cleaning. (Tr. at 41-42.) Plaintiff also stated that he and his girlfriend watch movies together at her house but that he does not play video games and does not read very often. (*Id.*)

Plaintiff testified that he was diagnosed with multiple sclerosis in 2007. (Tr. at 42.) When asked by the ALJ what happened in between the time that he was diagnosed and the alleged onset date of October 2008, Plaintiff responded that he tried to do what he could. (Tr. at 43.) Plaintiff testified that he was receiving shots "once a week for muscle spasms [] so I could feel my fingers and toes" and that he "take[s] methadone for pain to try to kill the weakness and the pain and the fatigue overall every day." (*Id.*) He stated that his headaches occur "sometimes every day" and

10

then "it won't come around for a day or two and sometimes I can't get out of bed for almost a week." (*Id.*) Plaintiff estimated that he gets 20 to 25 headaches per month. (Tr. at 47-48.) He described the side effects of his medication, stating that with "[t]he Solu-Medrol, I guess the easiest way to explain it to somebody is feeling like you got hit by a truck or a backwards hangover where you get better, you get worse. My shot does the same things to me. They do help." (Tr. at 44.)

Plaintiff also stated that he was working two part-time jobs in December 2009, but that he "couldn't do it anymore. I had to quit one." (*Id.*) Plaintiff stated that it was the repetitive motion and "doing it over and over again" that made him "real winded and fatigued." (Tr. at 47.)

Plaintiff indicated that he smokes about a pack every three or four days and has not been able to quit, despite doctor's advice that he do so because of the "[s]tress factor with my multiple sclerosis. Feelings, emotions and stress is hard on me, more harder on me than just about anything, and I smoke just enough to try to keep the stress out if I can afford it." (Tr. at 45.) Plaintiff stated that he feels he cannot work because he "cannot be reliable day to day. I don't know how I'm going to feel from one day to the next." (*Id.*) Plaintiff added that after he had been on his medications "for approximately a year and a half I started noticing, I started feeling back to normal, but as soon as I lost . . . the medical insurance it all went downhill from there and it's just kind of been a backwards battle." (Tr. at 45-47.)[3] Plaintiff indicated that he stopped receiving medication in December 2009. (Tr. at 47.)

The ALJ asked the Vocational Expert ("VE") to assume a person with Plaintiff's background who

> would need to avoid workplace hazards such as dangerous moving machinery, unprotected work heights, avoid climbing ladders. Could engage in activities such as climbing stairs, crouching, crawling, kneeling, stooping or bending on an occasional basis as opposed to more often like frequent, and would need the ability to perform this work either seated or standing at his option.

---

[3]Page 46 of the transcript is blank.

(Tr. at 50.) The VE responded that such a person could not perform Plaintiff's past work but could perform simple unskilled jobs, including the 3,000 bench assembler and 1,500 plastic sorter jobs available in Southeastern Michigan at the sedentary level. (Tr. at 51.) The VE further testified that "[n]one of these jobs use arm controls," so limitations regarding pushing and pulling would not have any effect on the jobs discussed. (*Id.*) The VE added that neither limitations as to fine manipulation nor the pushing or pulling of leg controls would have any effect on the jobs discussed either. (Tr. at 51-52.) The VE also testified that if Plaintiff's testimony were assumed fully credible, he could not perform any jobs because of his "[t]estimony regarding having good and bad days" since "[c]ompetitive employment expects you to show up as scheduled 40 hours a week." (Tr. at 52-53.) When asked by the ALJ, the VE testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") "[o]ther than the sit/stand option, [because] the DOT does not make note of that. That's based on professional experience, witnessing the jobs and DOT companion manuals." (Tr. at 53.)

### F. Analysis and Conclusions

#### 1. Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 21-25.)

Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

S.S.R. 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 10.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ's evaluation of the treating physicians' restrictions is not supported by substantial evidence. (Doc. 10 at 13-17.) The treating physician Plaintiff refers to is Dr. Lee Marshall. (*Id.* at 15-16.) Plaintiff contends that the ALJ improperly relied on one cervical MRI rather than Dr. Marshall's findings that Plaintiff could not use his hands or feet for repetitive movement and that Plaintiff can only sit for three hours and stand or walk for three hours in an eight-hour workday due to fatigue, disorganization, and weakness of motor function. (*Id.* at 16.)

As noted earlier in this Report, pages 594 to 736 of the administrative record were admitted into evidence at the Appeals Council stage and are not a part of the record subject to judicial review for substantial evidence.[4] *See Cline,* 96 F.3d at 148; *Cotton,* 2 F.3d at 696.

### a. Treating Source Standards

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do

---

[4]I further note that the ALJ's decision does not list exhibit 24F, which is comprised of pages 425 to 430 of the administrative record, as one of the exhibits considered by the ALJ. (Tr. at 28.)

13

despite the impairment(s), and physical and mental restrictions." SSR 06-3p, 2006 WL 2329939, at *2 (2006).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special significance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of vocational factors. 20 C.F.R. § 404.1527(d)(3). A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011). "Otherwise, the hearing would be a useless exercise." *Id.*

In addition, "a treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation," i.e., he or she "'may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Id.* at 1073 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). "Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar

14

cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). Once the treating source is placed on the same level as other medical opinions, the treating source opinion should not be subjected to "greater scrutiny" than the non-treating sources, especially when there are more flagrant inconsistencies in the opinions of the non-treating sources. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379-80 (6th Cir. 2013).

If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors may be applied to all medical opinions, not just treating sources. SSR 06-3p, 2006 WL 2329939, at *3 (2006). However, because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "Acceptable medical sources" who can be considered treating sources include "licensed or certified psychologists." SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439

15

(6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

    **b.**    **Analysis**

The ALJ in the instant case gave "substantial weight" to Dr. Marshall's functional capacity opinion of December 1, 2008, because it was "supported by Dr. Marshall's own findings and by the record as a whole." (Tr. at 24.) However, as to the opinions of Dr. Marshall dated July 2010 and the undated opinion (at pages 592 and 593 of the administrative record), the ALJ "afforded [them] little weight as these opinions are not supported by the record as a whole or by Dr. Marshall's own findings contained in his treatment notes. Further, the undated opinion provides no explanation for any of the opinions." (*Id.*)

Dr. Marshall's December 1, 2008, opinion, which was given substantial weight, concluded that "Mr. Vincil is not capable of work requiring extensive physical labor, climbing, or working at heights with dangerous machinery as he still suffers from some dyscoordination with numbness

16

and tingling of the extremities." (Tr. at 432, 439.) The opinion did not expressly state that Plaintiff would be capable of work on a sustained basis that avoided heights and dangerous machinery, but it could be implied from the statement, and the ALJ apparently made such an implication.

> The opinions that were given little weight included Dr. Marshall's findings that
>
> > [d]espite treatment with immunomodulatory therapy, Mr. Vincil continues to experience problems with gait imbalance, diminished stamina, endurance, and pain relating to muscle spasticity. It is my neurological opinion that he is unable to maintain employment in any position for a 12-month period of time. It is hopeful that his condition will stabilize to the point of allowing gainful employment subsequently.

(Tr. at 519.) In addition, little weight was given to Dr. Marshall's findings that Plaintiff could sit for three hours, stand or walk for three hours of an eight-hour workday, occasionally lift up to twenty pounds, and perform simple grasping, but could not use arm or leg controls or perform fine manipulation, and that he would require one twenty-minute rest period per hour in addition to a thirty-minute lunch. (Tr. at 426-27.) Finally, little weight was given to Dr. Marshall's findings that, as a result of Plaintiff's multiple sclerosis, he has "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements or gait end station" and "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." (Tr. at 593.)

The evidence of record cited by the ALJ that she found to be inconsistent with the later opinions of Dr. Marshall were treatment notes indicating that Plaintiff's condition was stable or even improved, and that headaches or other symptoms were much improved or well-controlled. (Tr. at 23-25.) I note that the record does contain such notations. (Tr. at 406, 410, 413, 415, 420, 430, 431, 433, 434, 438, 440, 456, 469, 470, 520-21.) However, there are also notations indicating that Plaintiff's symptoms, including headaches, pain, imbalance and fatigue, persisted during the same relevant time frame. (Tr. at 402, 406, 408, 415, 439, 519.)

17

If Plaintiff's impairment were one subject to linear decline or improvement, such as a broken bone, evidence of improvement might be considered "inconsistent" with a physician's opinion that a patient is disabled; however, multiple sclerosis is, by its very nature, a disease that waxes and wanes. *See Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990) ("Multiple sclerosis is an incurable, progressive disease subject to periods of remission and exacerbation."); *Anderson v. Comm'r of Soc. Sec.*, 440 F. Supp. 2d 696, 699 (E.D. Mich. 2006) ("multiple sclerosis is a disease that requires a longitudinal evaluation"). There is no medical evidence that Plaintiff was misdiagnosed or cured of multiple sclerosis.

I therefore suggest that the presence of some signs of periodic remission is not inconsistent with Dr. Marshall's opinions nor is it sufficient to discount the opinion of Plaintiff's treating neurologist. *See Wilson, supra*; *Powell v. Comm'r of Soc. Sec.*, No. 11-CV-15074, 2013 WL 1189715, at * (E.D. Mich. Mar. 22, 2013) ("The fact that Plaintiff's 'multiple sclerosis was relatively stable' is not inconsistent with Dr. Elias' opinion, as he does not indicate he bases his opinion on any exacerbation of this condition" and "[t]he fact that a person's condition is 'relatively stable' does not mean it is not disabling.").

Accordingly, I suggest that the ALJ's decision is not supported by substantial evidence and should be reversed.

Once it has been determined that the Commissioner's administrative decisions are not supported by substantial evidence, a district court faces a choice. It may either remand the case to the Commissioner for further proceedings or direct the Commissioner to award benefits. The court may reverse and direct an award of benefits if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits . . . where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Felisky,* 35 F.3d at 1041; *accord, Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). This comports with the principle that "where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a

ping-pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F3d 541, 547 (6th Cir. 2004) (citations omitted).

In this case, for the reasons set forth above, I conclude that there are no unresolved legal or factual issues and that the record adequately establishes Plaintiff's entitlement to benefits. I therefore suggest that the ALJ's decision should be reversed and the case remanded for an award of benefits.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

　　　　　　　　　　　　　　　　　　s/ Charles E Binder
　　　　　　　　　　　　　　　　　　CHARLES E. BINDER
Dated: May 2, 2013　　　　　　　　　United States Magistrate Judge

19

**CERTIFICATION**

    I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: May 2, 2013                    By     s/Patricia T. Morris
                                               Law Clerk to Magistrate Judge Binder